IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, Sean Rice Special | ) | 19 C 197 |
| Representative for ROBERT RICE, deceased, | ) | |
| Mary A. Nitsche Special Representative for | ) | Judge John J. Tharp, Jr. |
| LAWRENCE NITSCHE, deceased, Victoria | ) | |
| Keough Special Representative for THOMAS | ) | |
| KEOUGH, deceased, JAMES THOMAS | ) | |
| MCARDLE, MICHAEL BOSCO, DANIEL | ) | |
| McWEENY, ROBERT FLOOD, GEORGE | ) | |
| WINISTORFER, ROBERT TOVAR, | ) | |
| and GERALD McGOVERN, | ) | |
| | ) | |
| Defendants. | ) | Jury Demand |

## SECOND AMENDED COMPLAINT

Plaintiff Kevin Bailey, by and through his attorneys, the People's Law Office, hereby alleges as follows:

### INTRODUCTION

1.      Plaintiff Kevin Bailey, an innocent man wrongly convicted for crimes he did not commit, spent close to 30 years in jail and prison because of the coercion and fabrication of false inculpatory evidence by the Defendants sued in this action.

2.      Mr. Bailey was arrested on June 7, 1989, when he was 19 years old, for a brutal murder and robbery of an elderly woman, Lula Mae Woods, the wife of a retired Chicago police sergeant, committed by one or more as-yet unidentified men. On October 18, 1990, Mr. Bailey was wrongfully convicted of first degree murder, burglary and armed robbery and was subsequently sentenced to 80 years imprisonment.

1

3.      No physical or forensic evidence connected Mr. Bailey or his co-defendant Corey

Batchelor to the crime. Defendant detectives of the Chicago Police Department coerced and

fabricated false confessions from Mr. Bailey and Mr. Batchelor and these confessions ultimately

ensured Mr. Bailey's and Mr. Batchelor's wrongful convictions.

4.      After the wrongful convictions, multiple rounds of DNA testing of evidence

connected to the crime did not match Mr. Bailey or Mr. Batchelor, demonstrating their

innocence. Thereafter, in January of 2018, Cook County Special State's Attorney Robert Milan

moved to vacate their convictions and dismiss the charges against them.

5.      On January 30, 2018, Mr. Bailey's and Mr. Batchelor's convictions for first

degree murder, burglary and armed robbery were vacated and the charges against them were

dismissed. That same day, Mr. Bailey walked out of prison a free man—almost three decades

after his initial arrest.

6.      Mr. Bailey has spent more than half of his life in prison, separated from his family

and friends, and robbed of the most basic of freedoms. He files this civil rights action to bring

Defendants' misconduct to light, to hold Defendants accountable for their actions, and to seek

justice for the many years of his life that he lost for a crime he did not commit.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of law of Plaintiff's rights as secured by the United States Constitution.

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a)

10.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b), in that this is the District in which the claims arose.

## PARTIES

11.     Plaintiff Kevin Bailey is an African-American man and was at all relevant times a resident of the State of Illinois.

12.     Defendant City of Chicago is an Illinois municipal corporation, was the employer of the individual Defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Chicago Police Department. The City of Chicago is liable for the wrongful acts of the individual Defendants, while acting within the scope of their employment, pursuant to its statutory obligations to indemnify them, and with respect to the state law claims pursuant to *respondeat superior*.

13.     Defendant Sean Rice is the special representative for Robert Rice, deceased. At all times relevant to this Complaint, Robert Rice was a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

14.     Defendant Mary A. Nitsche is the special representative for Lawrence Nitsche, deceased. At all times relevant to this Complaint, Lawrence Nitsche was a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

15.     Defendant James McArdle was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police officer, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

16.     Defendant Michael Bosco was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

17.     Defendant Victoria Keough is the special representative for Thomas Keough, deceased. At all times relevant to this Complaint, Thomas Keough was a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

18.     Defendant Daniel McWeeny was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

19.     Defendant Robert Flood was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

20.     Defendant George Winistorfer was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

21.     Defendant Robert Tovar was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police officer, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

22.     Defendant Gerald McGovern was, at all times relevant to this Complaint, a duly appointed and sworn Chicago Police detective, who engaged in the conduct complained of in the course and scope of his employment. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### The Crime

23.     At 1:45 p.m. on the rainy afternoon of June 1, 1989, Lula Mae Woods, the wife of a retired Chicago police officer, deposited a check at the First National Bank of Evergreen Park at 95th and Utica in Evergreen Park and withdrew $100.

24.     At 2:15 p.m., a neighbor of Ms. Woods drove past the open garage in the alley at the Woods home at 9310 S. Union, Chicago, and saw Mr. Woods' body lying face up, with her legs extending out of the garage. There was blood visible on Ms. Woods' chest and the neighbor immediately returned to her home and called 911.

25.     A Chicago Police sergeant, who was working patrol that day, was in the area and arrived at the scene shortly after getting a simulcast radio call. The sergeant checked for vital signs, found none, and called for paramedics and assistance. Other officers arrived shortly after, and the scene was protected.

26.     Ms. Woods was found motionless, lying face up to the rear of the parked car in her garage. The trunk of the car was open. She had two stab wounds to her chest and one incised, more superficial wound, to her abdomen.

27.     There were two sets of keys found at the crime scene—one to the left of Ms. Woods' head and a second just below Ms. Woods' right knee. This second set of keys was in a pool of blood between a black leather purse strap, which also lay in the pool of blood, and a white blood-stained towel with red trim that Ms. Woods kept in her car.

28.     One shaft of dark brown and one shaft of brown to dark brown human hair were found on the towel.

29.     Ms. Woods' body lay on top of a Domino's pizza hat.

30.     Subsequent investigation revealed that the hat did not belong to Ms. Woods or anyone in her family. There was one fragment of brown to dark brown human hair located in the hat.

31.     The mobile crime scene unit recovered all of these pieces of evidence, including the hat, towel, and the hairs found on the towel and in the hat.

32.     When other officers arrived they began searching for evidence. By 4:00 p.m., officers found and recovered a bloody, six-inch steak knife with a wooden handle and serrated blade laying on the sidewalk at 9245 South Emerald, about a half block from Ms. Woods' body.

33.     At approximately 5:15 p.m., different officers found the victim's black purse—with the strap missing—in a closed garbage can in the alley at 9214 South Emerald. Ms. Woods' passbook with a plastic cover from the First National Bank of Evergreen Park was found on the street within a couple of feet of the garbage can, as were Ms. Woods' deposit slips from that bank. No money was found in or near the purse.

34.     Police reports from that time indicate that seven suitable prints were recovered from various items inside Ms. Woods' purse, including two on a receipt, one on a business card, one on a check register, two on an envelope, and one on a note. Investigators made unsuccessful attempts at that time to recover latent fingerprints from the keys, the purse strap, the purse, the passbook, and deposit slips. They did not attempt to retrieve latent prints from the knife.

35.     According to police, in the days following the murder, an informant by the name of Larry Johnson implicated Corey Batchelor in the murder. Johnson, who is now deceased, was known by the police to be an alcoholic, a dope fiend, and a liar, was himself a suspect in the murder and robbery, and any statements he made to police were insufficient to constitute probable cause to arrest Corey Batchelor.

### Corey Batchelor's Fabricated and Coerced Confession

36.     On June 6, 1989, Chicago police officers stopped in front of Corey Batchelor's house, and Larry Johnson, who was in the back of one of the police cars, pointed in his direction. Police arrested Mr. Batchelor and drove him to Area 2 Police Headquarters.

37.     Mr. Batchelor was placed in an interview room where he was interrogated by Area 2 detectives, including Defendants Rice, Nitsche, Keough, Bosco, McWeeny, McGovern and Tovar for an extended period of time. Mr. Batchelor told the detectives he was innocent, and that all that happened was that he and Mr. Bailey found some money that day.

38.     At some point during the interrogation, the detectives started telling Mr. Batchelor that he was lying. When they were unable to elicit a confession from Mr. Batchelor, Defendants Rice, Nitsche, Keough, Bosco, McWeeny, McGovern and Tovar resorted to physically and mentally coercive tactics, including verbal threats and physical violence, wherein these Defendants, *inter alia*, kicked, choked, slapped, and banged Mr. Batchelor's head against the wall.

39.     These Defendants, acting jointly and conspiracy with Defendants Winistorfer and Flood, subjected Mr. Batchelor to a polygraph examination in an effort to manipulate him into providing a false confession.

40.     Defendant Tovar administered the polygraph examination, and he, along with Defendants Winistorfer and Flood, conspired to fabricate, and fabricated, police reports related to the polygraph examination.

41.     After additional physical and psychological coercion by Defendants Rice, Nitsche, Keough, Bosco, McWeeny, McGovern and Tovar, in which they utilized the results of the sham polygraph examination, Mr. Batchelor, unable to take the torture and abuse any longer

7

and afraid of what these detectives would do to him if he continued to proclaim his innocence, agreed to make a court reported statement to an Assistant State's Attorney, falsely implicating himself and Mr. Bailey in the crime.

### Kevin Bailey's Fabricated and Coerced Confession

42.    On June 7, 1989 at 6:15 a.m., a Chicago police detective telephoned Kevin Bailey at his house and asked him if he would answer some questions, but did not tell him that the questions related to the murder of Ms. Woods. Mr. Bailey agreed to speak to the detective at his home.

43.    Defendant detective McWeeny arrived at Mr. Bailey's home and instructed Mr. Bailey to go with him in his car to the police station and Mr. Bailey complied, believing he had no choice in the matter. McWeeney then drove Mr. Bailey to Area 2 Police Headquarters.

44.    When they arrived at Area 2, Mr. Bailey was taken to the second floor, placed in a room and was questioned by a number of detectives, including Defendants Rice and Nitsche, about the murder of Ms. Woods.

45.    Throughout the entire morning of June 7, Mr. Bailey repeatedly told Defendants Rice, Nitsche and the other Area 2 detectives who questioned him that he did not murder Ms. Woods.

46.    Eventually, Defendants Rice and Nitsche drove Mr. Bailey to the police station at 11th and State Street in Chicago where he was given a polygraph examination by Defendant James McArdle. When the polygraph was purportedly completed, Defendant McArdle falsely told Mr. Bailey that he had failed the lie detector test, and he then invited Detectives Rice and Nitsche into the room. Subsequently, Defendants McArdle and Nitsche left the room, and Mr. Bailey was left alone in the room with Defendant Rice.

47. Defendant Rice then accused Mr. Bailey of committing the murder of Ms. Woods. Mr. Bailey continued to deny his involvement and asked to take another polygraph to prove it. Defendant Rice told him that would not be possible for another 24 hours. Defendant Rice then became increasingly upset, yelled at Mr. Bailey, grabbed Mr. Bailey by the throat and choked him, and told him that if he did not confess, he would be sorry.

48. Mr. Bailey was very scared: Defendant Rice was bigger than him, and Mr. Bailey was only 19 at the time and had never before been arrested or interrogated. Defendant Rice's threats, physical abuse, and Mr. Bailey's fear that this abuse would continue, caused Mr. Bailey to falsely state that he committed the crime and to repeat this confession in a court reported statement to an Assistant State's Attorney.

49. In his court reported statement, Mr. Bailey repeated the details of the crime that were provided to him by Defendants Rice and Nitsche, who repeatedly made Mr. Bailey rehearse his statement with them before they transported him back to Area 2 Police Headquarters.

50. Defendants Nitsche and McArdle were nearby when Defendant Rice physically abused and threatened Mr. Bailey, were aware that Defendant Rice was going to abuse and threaten Mr. Bailey in order to get him to falsely confess, knew that Defendant Rice was abusing and threatening Mr. Bailey in order to get him to falsely confess, and they had the opportunity and duty to intervene to prevent the abuse, but failed to do so.

51. Defendants Rice, Nitsche and McArdle created false and fabricated police reports stating that Mr. Bailey had voluntarily confessed to the murder of Ms. Woods when they knew he had not.

52. Defendants Rice and Bosco met with the Felony Review Assistant State's Attorney from the Cook County State's Attorney's Office at Area 2 Police Headquarters and

informed him that Mr. Bailey had confessed to killing Lula Mae Woods, without telling him that Mr. Bailey was physically and mentally coerced into giving a false statement.

53.     Defendants also told the Assistant State's Attorney that Mr. Batchelor had confessed to killing Lula Mae Woods, and that he had implicated Kevin Bailey in the killing, without telling the Assistant State's Attorney that Mr. Batchelor had also been physically and mentally coerced into giving the confession.

### The Physical Evidence

54.     After the arrests and confessions of Mr. Bailey and Mr. Batchelor, the State attempted to match the physical evidence recovered from the crime scene to them.

55.     First, the hairs recovered from the bloody white towel with red trim were compared to hairs recovered from Mr. Bailey and Mr. Batchelor. This testing revealed that the hairs on the towel were "dissimilar" to Mr. Bailey's and Mr. Batchelor's hairs.

56.     Additionally, comparison of the hair found in the Domino's pizza hat revealed that Mr. Bailey and Mr. Batchelor were excluded as the source of that hair as well.

57.     No attempts were made at that time to analyze whether the hair in the hat was similar to either of the hairs on the towel.

58.     The latent prints recovered from various items in the purse, including the prints located on the business card and the secretary of state envelope, were compared with Mr. Bailey's and Mr. Batchelor's prints, and they were both excluded as the source of these prints.

### The Wrongful Conviction

59.     As a result of the wrongdoing of the Defendants, as set forth above, including the coercion and fabrication of statements from Corey Batchelor and Plaintiff Kevin Bailey, and despite the fact that there was no physical evidence linking Mr. Bailey to the crime, Mr. Bailey

was charged with the murder, burglary and armed robbery of Ms. Woods and imprisoned pending trial in the Cook County Jail.

60.     The Defendants failed to advise prosecutors that they had engaged in the wrongdoing set forth above, including fabricating and coercing the confessions of Mr. Bailey and Mr. Batchelor.

61.     Mr. Bailey litigated a pre-trial motion to quash his arrest and suppress his confession but based on the false testimony and false police reports of the Defendants the court denied the motion.

62.     In October 1990, Mr. Bailey stood trial for the murder, burglary and armed robbery of Lula Mae Woods.

63.     The only evidence presented that implicated Mr. Bailey was his false, fabricated and coerced confession.

64.     Because the Defendants had coerced and fabricated a statement from Corey Batchelor that implicated both Batchelor and Bailey, Bailey was unable to present evidence from Batchelor that would have contradicted the account of the murder and robbery as set forth in Bailey's fabricated and coerced statement.

65.     As a proximate result of the above-described wrongful conduct on the part of the Defendants, the jury convicted Mr. Bailey of the murder, burglary and armed robbery of Ms. Woods.

66.     On November 8, 1990, Mr. Bailey was sentenced to an extended term of 80 years in prison for the murder and concurrent terms of 30 years for armed robbery and seven years for burglary.

**Post-Conviction DNA and Fingerprint Testing and Plaintiff's Exoneration**

67.     Throughout his prosecution and incarceration, Kevin Bailey maintained his innocence.

68.     In 2004, Mr. Bailey began to seek forensic testing in the hopes of proving his innocence.

69.     Advanced DNA testing was successfully conducted on two different hairs: (1) the fragment of brown to dark brown human hair found in the Domino's pizza hat that was left at the scene by the murderer; and (2) one of the hairs on the towel that belonged to Ms. Woods that was found adjacent to, but on top of, a pool of her blood.

70.     DNA testing was also attempted on the other hair that was found on the towel, but that hair did not contain mitochondrial DNA.

71.     DNA profiles from the hair found in the Domino's pizza hat and the hair on the towel were compared to each other. The DNA analysis showed that the two hairs came from a male, had identical DNA, and were consistent with coming from the same man. Subsequent DNA analysis showed that there was only one chance in 9,133 of the hairs **not** coming from the same person.

72.     DNA profiles obtained from the hair in the Domino's pizza hat and the hair on the towel were compared to Mr. Bailey, Mr. Batchelor, Ms. Woods and her family, and a number of police officers who were present at the scene. Each was excluded as the source of these hairs.

73.     DNA testing was conducted on swabbings of the straps, inner openings, inner flap, and snap areas of Ms. Woods' purse—areas that would have been handled by the murderer in cutting the purse strap away from the victim and later rooting through its contents.

12

74.     The combined swabbings produced a partial DNA profile that appeared to be a mixture of two males. Both Mr. Bailey and Mr. Batchelor were excluded as the source of these two male profiles.

75.     Because of the incomplete nature of the profile obtained from the swabbings, it was not possible to determine whether or not the person or persons whose DNA was identified from the swabbings was the same as the person who left his hair in the hat or on the towel, but the testing did not exclude that possibility.

76.     The seven latent prints recovered from inside the victim's purse were re-tested using advanced technology that was not available during the initial investigation. Two separate prints on a receipt in Ms. Woods' purse were non-probative, as they matched Ms. Woods. Two additional prints found on a secretary of State envelope, and a third one on a business card, excluded Mr. Bailey, Mr. Batchelor, and Ms. Woods. Two additional prints—one on a check register and one on a note—also excluded Mr. Bailey, Mr. Batchelor, and Ms. Woods. The identification of an unknown print on Ms. Woods's check register was particularly relevant because the murderer clearly handled her passbook, leaving the plastic case and deposit slips on the ground next to where the purse was stashed.

77.     In 2017, the Conviction Integrity Unit of the Cook County State's Attorney's Office conducted a seven month review of Mr. Bailey's and Mr. Batchelor's cases.

78.     Subsequently, the Cook County State's Attorneys' Office withdrew from Mr. Bailey's pending combined post-conviction and § 2-1401 petition and Special State's Attorneys were appointed to represent the State's interests in these proceedings. Special State's Attorney Robert Milan conducted a thorough investigation and review of the case and, on January 30, 2018, moved to vacate Mr. Bailey's and Mr. Batchelor's convictions.

79.     That same day, Cook County Criminal Court Judge Alfredo Maldonado entered an order that granted the motion for relief of judgment and to vacate the convictions, and dismissed the charges against Mr. Bailey and Mr. Batchelor.

**Suppression, Withholding and Destruction of Exculpatory and Impeachment Evidence**

80.     Several Chicago Police Department gang crimes specialists were involved in the Woods homicide investigation, including Gang Crimes Officers Cruz and Worsham and Gang Crimes Sergeants Saternus and Pacanowski. Among other tasks, the gang crimes specialists gathered information on and arrested alternate suspects.

81.     While the detective division maintained one Woods homicide investigation file, the gang crimes office maintained another separate and parallel Woods homicide investigation file under a separate Records Division number.

82.     On information and belief, the gang crimes file contained exculpatory and impeachment evidence, including information implicating people other than Plaintiff as offenders and other evidence pointing away from Plaintiff as the perpetrator.

83.     The CPD documents that were produced to Plaintiff in advance of his criminal trial contained no notes or reports from any of the gang crimes specialists.

84.     The gang crimes file related to the Woods homicide investigation was never produced to Plaintiff.

85.     On information and belief, the Defendants and other area detectives assigned to the case also maintained a parallel working or "street" file regarding the Woods homicide investigation. The area detectives' street file(s) would have contained information shared between the area detectives and the gang crimes specialists.

86.     On information and belief, because the City of Chicago had a policy, practice and custom during this time of suppressing street files, and in order to suppress evidence that would have undermined their case against Plaintiff and Batchelor, the Defendants suppressed the information contained in their street files(s), including the information developed through the gang crimes investigation.

87.     In 2006, the City of Chicago destroyed the gang crimes file related to the Woods homicide investigation.

### The Defendants' Misconduct Was Committed in Furtherance of a Conspiracy

88.     All of the Defendants, acting jointly and with other police investigative, supervisory and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below. By and through these overt acts, each Defendant, jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement and imprisonment and the excessive use of force; his right to be free from involuntary self-incrimination; his right to access to the courts and to a fair and impartial trial; and his right to equal protection of the law, all as protected by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### The Pattern and Practice of Torture and Abuse of Suspects at Area 2 Police Headquarters

89.     The physical abuses of Mr. Bailey and Mr. Batchelor were not isolated incidents of individual police officer torture, brutality and misconduct. Rather, the interrogation, torture

and abuse of Mr. Bailey and Mr. Batchelor in pursuit of confessions was part of a long-standing pattern and practice of similar acts of torture and abuse under the supervision, and with the encouragement, participation and ratification of Area 2 Violent Crimes Commander Jon Burge and his supervisory successors, and were the result of the City of Chicago's policies and practices of, *inter alia*, pursuing wrongful convictions through reliance on profoundly flawed investigations and coerced and fabricated confessions, the failure to produce exculpatory material to criminal defendants, the failure to adequately train, supervise, monitor and discipline Chicago police officers, and the police code of silence.

90.     Because Jon Burge, who was, for years, the commanding lieutenant of several of the defendants including*, inter alia*, Defendants Rice, Nitsche, Bosco, McWeeney and Flood, condoned and directly participated in acts of torture and physical abuse of suspects, detectives under his supervision and command came to believe that they could torture and physically abuse suspects with impunity. Since torture and physical abuse often produced confessions and closed cases, which were rewarded with promotions, it was expedient for these officers to engage in these forms of horrific violations. These detectives continued the torture and abuse of suspects in order to gain confessions long after Burge left Area 2.

91.     The widespread pattern and practice of torture and physical abuse at Area 2 under Burge is well-established and has been recognized and acknowledged for decades by numerous state and federal courts, administrative bodies, prosecutors, and the City of Chicago. For example:

    a.     In August of 1989, in *Wilson v. City of Chicago*, No. 86 C 2360 (N.D. Ill.), a
    federal jury found that the CPD had a policy and practice of "allowing police officers to
    torture persons suspected of killing or wounding officers."

16

b.      On November 2, 1990, OPS Director Gayle Shines approved as "compelling" and forwarded to Superintendent LeRoy Martin, Sr. the 25-page Report and findings made by OPS investigator Michael Goldston that identified 50 instances where African American suspects in the custody of Area 2 detectives under Burge's command were subjected to torture or other abuse, including the general findings that there was "systematic" torture under Burge in which command personnel participated.

c.      In *U.S. ex. rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999), Judge Milton Shadur found:

> It is now common knowledge that in the early to mid-1980's Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.

d.      In her concurring opinion in *Hinton v. Uchtman*, 395 F.3d 810, 822-23 (7th Cir. 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

> [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area 2 station of the Chicago Police Department…

e.      In its July 2006 Report into criminal wrongdoing at Area 2, the Cook County Special Prosecutor found, among other things:

> Burge was "guilty [of] abus[ing] persons with impunity," and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they."

f.      Numerous Chicago City Council Members, during the July 24, 2007 public hearings on Area 2 torture, acknowledged longstanding notice of, and strongly condemned the "serial torture operation" and "pattern" of "heinous" "atrocities" at Area 2 under Burge that was "condoned" and "acquiesced in."

17

g.    In *United States v. Burge*, 711 F.3d 803, 806 (7th Cir. 2013), the Seventh Circuit Court of Appeals, affirming Burge's convictions for obstruction of justice and perjury, found:

> Former Chicago Police Commander Jon Burge presided over an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette.

h.    In 2015, Chicago Mayor Rahm Emanuel and the Chicago City Council passed a Reparations Ordinance and Resolution, in which the City, among other things, provided $5.5 million in compensation to 57 living survivors of Burge-related police torture and numerous non-financial benefits including an official apology, a public memorial, a counseling center, and teaching of the torture scandal in the Chicago public schools.

92.    The practices described above and below were consciously approved at the highest policy-making level for decisions involving the Department, and proximately caused the injuries suffered by Plaintiff.

93.    The Defendants' coercion of false statements from Mr. Bailey and Mr. Batchelor was also undertaken pursuant to, and proximately caused by, a policy and practice on the part of the Department of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, especially against persons accused of crimes against Chicago Police Department officers or retired officers, and family members of CPD officers or retired officers, which has caused numerous false confessions and led to numerous wrongful convictions.

94.    The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used similar tactics to those employed by the Defendants against Mr. Bailey and Mr. Batchelor in this case. These tactics

include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) the use of the polygraph as a false evidence ploy in which an arrestee was falsely told that he had failed the polygraph and he should therefore confess; (e) false promises to arrestees that they would not be prosecuted or imprisoned if they confessed; and (f) use of other unlawful tactics to secure the arrest, prosecution, conviction, and imprisonment of innocent persons.

95.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, Department Officers, including, but not limited to, the Defendants, refused to report and otherwise lied and committed perjury about misconduct committed by their colleagues, including the misconduct at issue in this case.

96.     As a result of the City of Chicago's established practice of suppressing, withholding and destroying exculpatory and impeachment evidence through the use of street files or parallel files, withholding not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct; failing to investigate cases in which the police are implicated in obtaining coerced and false confessions, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers, including the Defendants named herein, came to believe that they could violate the constitutional rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

97.     The City's failure to train, supervise, monitor and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendants

19

committed against Mr. Bailey and Mr. Batchelor in this case. Constitutional violations that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above, and these policies and practices were a moving force behind these violations.

98.     The City of Chicago and officials within the Chicago Police Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful policies and practices and ensured that no action would be taken to remedy Plaintiff's ongoing injuries.

99.     The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Damages**

100.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Bailey sustained injuries and damages, including loss of his freedom for almost thirty years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, and emotional distress. In addition, he also sustained further injuries and damages, including loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression, for which he is entitled to monetary relief.

### COUNT I – 42 U.S.C. § 1983
### Fifth and Fourteenth Amendments – Unlawful Interrogation

101.    Each paragraph of this Complaint is incorporated as if restated fully herein.

102.    In the manner described more fully above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, coerced and forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth and Fourteenth Amendments.

103.    As described more fully above, the Defendants conducted an unconstitutional interrogation of Plaintiff, which caused Plaintiff to make involuntary statements implicating himself in the Woods crimes.

104.    The false statements scripted and coerced by the Defendants and attributed to Plaintiff were used against Plaintiff to his detriment in the criminal case and were a proximate cause of his deprivation of liberty. These statements were, *inter alia*, the reason that Plaintiff was charged, jailed, prosecuted and convicted of the crimes committed against Lula Mae Woods.

105.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Plaintiff's clearly established constitutional rights.

106.    As a result of the Defendants' unconstitutional conduct as described in this Count, Plaintiff suffered injuries as set forth above, including but not limited to physical injury, loss of liberty, and emotional distress.

### COUNT II – 42 U.S.C. § 1983
### Fourteenth Amendment – Violation of Due Process

107.    Each paragraph of this Complaint is incorporated as if restated fully herein.

108.    As described more fully above, all of the Defendants, while acting individually,

jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

109.    In the manner described more fully above, the Defendants, individually, jointly, and/or in concert and in conspiracy, caused and/or continued Plaintiff's wrongful charging, prosecution, conviction and imprisonment by committing or causing to be committed one or more of the following acts: physically and mentally coercing, constructing and fabricating the false and totally unreliable confessions, statements and reports, as described above, which formed the basis for Plaintiff's charging, prosecution and conviction; by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these confessions, statements and reports were false, unreliable, fabricated and physically and mentally coerced; and by suppressing, withholding, and destroying exculpatory and impeachment evidence of systematic torture and abuse at Area 2 and other exculpatory and impeachment evidence through the use of street files or parallel files.

110.    Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been jailed, convicted, imprisoned and otherwise deprived of liberty.

111.    The Defendants' misconduct directly and proximately caused the unjust and wrongful pre-trial detention, criminal conviction, wrongful imprisonment and deprivation of liberty of Plaintiff, thereby denying him his constitutional right to fair hearings and a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

112.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established

constitutional rights.

113.    As a direct and proximate result of this violation of his constitutional right to due process, Plaintiff suffered injuries as set forth above, including but not limited to loss of liberty, physical injury and emotional distress.

### COUNT III – 42 U.S.C. § 1983
### Fourth Amendment – Deprivation of Liberty Without Probable Cause

114.    Each paragraph of this Complaint is incorporated as if restated fully herein.

115.    The Defendants caused Plaintiff to be unreasonably seized, detained, imprisoned and deprived of his liberty without probable cause to believe that he had committed a crime, in violation of his rights secured by the Fourth Amendment to the United States Constitution.

116.    The misconduct described in this Count was undertaken pursuant to Defendant City of Chicago's policies and practices as set forth in this Complaint above and below.

117.    As a result of this misconduct, Plaintiff lost his freedom and sustained, and continues to sustain, injuries, including physical injury and sickness and emotional pain and suffering.

### COUNT IV – 42 U.S.C. § 1983
### Fourth and Fourteenth Amendments – Failure to Intervene

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    Defendants Rice, Nitsche, Bosco, Keough, McArdle, McWeeny, Flood, Winistorfer, Tovar and McGovern were aware of the constitutional violations as set forth above and had the opportunity and duty to intervene and prevent the violation of Plaintiff's constitutional rights, but they failed to do so.

120.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established

23

constitutional rights.

121.    As a direct and proximate result of these Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries as set forth above, including but not limited to loss of liberty, physical harm, and emotional distress.

### COUNT V – 42 U.S.C. § 1983
### *Monell* Policies and Practices

122.    Each paragraph of this Complaint is incorporated as if restated fully herein.

123.    The actions of all the individual Defendant Officers were undertaken pursuant to policies, practices, and customs of the Chicago Police Department, described above, which were approved, encouraged, and/or ratified by policymakers for the City of Chicago with final policymaking authority.

124.    These policies and practices included the suppression, withholding and destruction of exculpatory and impeachment evidence through the use of street files or parallel files, the failure to adequately train, supervise, monitor, and discipline officers who engaged in the constitutional violations, as set forth in greater detail above, pursuing wrongful convictions through reliance on profoundly flawed investigations and coerced and fabricated confessions, and the police code of silence

125.    One or more of the policies, practices, and customs described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

126.    As a direct and proximate result of the City's actions and inactions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth in this Complaint.

## COUNT VI - State Law Claim
## Malicious Prosecution

127.     Each paragraph of this Complaint is incorporated as if restated fully herein.

128.     The Defendants accused Plaintiff of criminal activity knowing that those accusations were without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence on the prosecution and to institute and continue the judicial proceedings.

129.     The Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no genuine probable cause. These judicial proceedings were instituted and continued maliciously, resulting in Plaintiff's wrongful prosecution, conviction and imprisonment, and the consequent injuries set forth above.

130.     Statements of the Defendants regarding Plaintiff's alleged culpability were made with knowledge that said statements were false. The Defendants also fabricated evidence by coercing false inculpatory statements from Plaintiff and his co-defendant and withholding exculpatory evidence that would have demonstrated Plaintiff's innocence. The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the crimes committed against Lula Mae Woods.

131.     The Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence that would have led to the actual perpetrators. The Defendants also withheld the facts of their manipulation and the resulting fabrications from Plaintiff and his attorneys.

132.     The misconduct described in this Complaint was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

133.     On January 30, 2018, the prosecution terminated in Plaintiff's favor when his

25

conviction was vacated and the charges dismissed.

134.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical injury and emotional distress.

## COUNT VII - State Law Claim
## Intentional Infliction of Emotional Distress

135.    Each paragraph of this Complaint is incorporated as if restated fully herein.

136.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as more fully alleged above.

137.    Defendants continued to engage in their misconduct as set forth above during the pendency of the Plaintiff's conviction and continued to conceal their misconduct.

138.    Plaintiff was legally unable to bring this cause of action until his convictions were vacated on January 30, 2018.

139.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer physical injury and severe emotional distress.

## COUNT VIII - State Law Claim
## Civil Conspiracy

140.    Each paragraph of this Complaint is incorporated as if restated fully herein.

141.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

142.    In furtherance of this conspiracy, the Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious

prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

143.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference.

144.    As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages as set forth above, including physical injury and severe emotional distress, as more fully alleged above.

## COUNT IX - State Law Claim
### *Respondeat Superior*

145.    Each paragraph of this Complaint is incorporated as if restated fully herein.

146.    In committing the acts alleged in the preceding paragraphs, each of the Defendants was an employee and agent of the Chicago Police Department and the City of Chicago, acting at all relevant times within the scope of his employment and under color of law.

147.    Defendant City of Chicago is liable as principal for all state law torts committed by the Defendants as alleged herein, including malicious prosecution, infliction of emotional distress, and conspiracy.

## COUNT X - State Law Claim
### Indemnification

148.    Each paragraph of this Complaint is incorporated as if restated fully herein.

149.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which its employees are liable for acts within the scope of their employment.

150.    The Defendants were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, from Defendants City of Chicago, Sean Rice, Special Representative for Robert Rice, deceased, Mary A. Nitsche, Special Representative for Lawrence Nitsche, deceased, Victoria Keough, special representative for Thomas Keough, deceased, James McArdle, Michael Bosco, Daniel McWeeny, Robert Flood, George Winistorfer, Robert Tovar and Gerald McGovern, and he further demands punitive damages against Defendants McArdle, Bosco, McWeeny, Flood, Winistorfer, Tovar and McGovern, plus attorneys' fees, the costs of this action, and whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff Kevin Bailey demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Ben H. Elson
John L. Stainthorp, Ben H. Elson
Joey L. Mogul, Brad J. Thomson
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070